## In re ALL STAR FEATURE CORP.

### Ex parte WILLAT FILM MFG. CO.

(District Court, S. D. New York. April 21, 1916.)

1. CONTRACTS ☞71(1)—CONSIDERATION—FORBEARANCE TO EXERCISE LEGAL RIGHT.

Forbearance to exercise a legal right, even without an express agreement to forbear, constitutes a good consideration for the giving of security.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 298, 316, 322, 324; Dec. Dig. ☞71(1).]

2. CORPORATIONS ☞409—LANDLORD AND TENANT ☞240—LIEN FOR RENT—ACTS OF CORPORATE OFFICERS.

Bankrupt, a film company, leased a studio, and as part of the consideration, expressed in the same instrument, employed the lessor to do certain work in developing its films. Under the terms of the lease, the lessor

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

was authorized to re-enter on default in payment of rent. At a time when rent was in arrears the lessor refused to release certain films until the rent was paid or secured, and it was then agreed by the managing officers of bankrupt that the lessor should have a lien on whatever films should be in its possession for all sums due it for rent or work, and bankrupt was permitted to remain in possession of the leased premises. *Held*, that such agreement was within the powers of the managing officers of bankrupt as pertaining to the management of its business, and that it gave the lessor a valid lien on such films as were in its possession at the time of the bankruptcy.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1620–1622; Dec. Dig. ☜409; Landlord and Tenant, Cent. Dig. § 982; Dec. Dig. ☜240].

3. BANKRUPTCY ☜471—CONTESTED CLAIM TO PROPERTY—COSTS.
    When a trustee contests the claim of an outsider, the controversy is inter partes, and costs follow as in any other case.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 873–877; Dec. Dig. ☜471.]

In Bankruptcy. In the matter of All Star Feature Corporation. On review of order of referee allowing claim of Willat Film Manufacturing Company to a lien on certain assets. Affirmed, with modification as to costs.

This is a petition by a trustee in bankruptcy to review the order of a referee in bankruptcy allowing a claim of the respondent upon certain assets of the bankrupt kept from the trustee under assertion of a pledge or lien. The property in question was a moving picture film which eventually, by the consent of the parties, was sold for $13,490, against which the claim of the respondent was $4,942.77. All the facts appear in the report of the referee and need not be repeated here.

On March 6, 1916, Referee Stanley W. Dexter filed the following memorandum on settlement of order allowing lien on special fund:

The claimant (Willat Studio) will be allowed interest of 2 per cent. (trust company interest) on the fund derived from the sale of the property covered by the lien from the date the money was received by the trustee, June 14, 1915. The claimant will be charged with actual costs incident to determination, sale, and payment of the lien, including the commissions of the trustee and referee on the amount of the lien paid to the claimant. Matter of Rauch, 36 Am. Bank. R. 75, 226 Fed. 982 (D. C. Va.) October 15, 1915.

I do not think that Judge Holt's decision to the contrary (In re Anders, etc., Co., 136 Fed. 995) applies to the case at bar, where the very existence of the lien was contested, and only allowed after a trial before the referee. The claimant sought the assistance of the bankruptcy court to adjudicate the merits of its claim, as well as to realize on its lien and enforce payment, and as a matter of law and discretion should be made to pay the officers of the court. As the matter is not free from doubt, I will certify the question to the district judge for his opinion.

In the matter of the reclamation claim of Willat Studios & Laboratories, Incorporated, the following is the decision of Referee Dexter:

A petition in bankruptcy was filed against the All Star Feature Corporation on January 30, 1915, an adjudication had on February 16, and Mr. Jeffries was appointed trustee on March 15, 1915. Among the assets claimed by the trustee were certain negatives and prints of motion pictures in the pos-

session of the Willat Studios & Laboratories, Inc., at Ft. Lee, N. J., retained for a lien for $4,942.77, claimed, but not conceded. Under these circumstances, an arrangement was made between the two corporations, whereby the Willat Studios delivered the property in question to the trustee of the All Star Corporation to be sold, expressly reserving its lien on the proceeds of sale. Thereupon the trustee proceeded to sell most of the property, realizing $13,490 therefor, and retaining certain negatives and prints still unsold. A stipulation gives in detail the proceeds of sale. (Stip. of Nov. 5, 1915.)

The original contract between the predecessor in title of the Willat Studios and the All Star Corporation (Exh. 1 of August 3, 1915) was entered into in May, 1914, and provided for a lease of a studio at Ft. Lee, N. J., belonging to the Willat Company (described as the lessor), for a period of one year, beginning not later than August 1, 1914; the lessor to furnish sufficient heat and lighting for photographic purposes (but not electric current) at a rental of $10,000, payable at the rate of $833.33 monthly in advance. "As a further consideration of the letting of these premises the lessee agrees that it will order printed from its negatives a yearly average of 1,200,000 feet of positive and negative films, to be printed and developed by the lessor on stock supplied by the lessee for the purpose which the lessee agrees that it will pay 1¼ cents per foot."

The lessor agrees to accept orders for 1,200,000 feet of printing and developing, on the same terms, and the lessee agrees in addition to the rental to pay for electric current and water, not to assign the lease nor sublet without the lessor's consent, and if any rent shall "be due and unpaid, or if default shall be made in any of the covenants herein contained, then it shall be lawful for the said lessor to re-enter the said premises and the same to have given, repossess and enjoy."

The lessee covenants to pay the yearly rent "as herein specified" and to quit and surrender the demised premises in good condition, and the lessor covenants for quiet possession.

These are all the covenants in the agreement. "The method of execution" of the agreement, except as to the monthly installments of rent, is not stated. Time of delivery and payment of the film work are not specified; but, in the absence of these terms, it must be presumed that such work was to be delivered on completion and paid for then.

It will be observed that any common-law lien under the agreement would be confined to the ordinary artisan's lien. Section 180 of the N. Y. Lien Law (Consol. Laws, c. 33). The contract was made in New York between two New York corporations and is to be construed by the law of New York, the lex loci contractus, and not by the law of New Jersey. It does not appear on the face of the agreement that the film work was to be performed exclusively in New Jersey, and as to the rent claim it does not appear that the law of New Jersey differs from that of New York. Dyke v. Erie R. R., 45 N. Y. 113, 6 Am. Rep. 43. There is no statutory lien for rent in New York, nor is it claimed for New Jersey. But the lienor claims a lien against the funds in the hands of the trustee arising from the sale of the property delivered under the stipulation, as of the date of adjudication for the entire balance then due, both for rent and film work. This lien is claimed to have arisen by agreement under the following circumstances:

The All Star Company entered into possession of the studio on September 1, 1914, and rent began from that date. One negative, the "Nightingale," was released October 10, 1914, without any payment being demanded. At that date the September rent was due and in arrears, and certain other charges, besides work done on the "Nightingale" negative. The next film to be released was "Shore Acres"; but, before it was released, Baumann (the president of the studio company) insisted on a personal assurance from Farnham, the general manager of the All Star Company, that before the "Shore Acres" prints would be released he would agree to pay the entire indebtedness on or before a certain date. The assurance was given, and a few days later the payment demanded was made; the picture "Shore Acres" having been released prior thereto on the strength of the personal assurance. Rent and charges for September were thus settled.

At a conference between Baumann and Farnham, held just prior to the re-

lease of "Shore Acres" above mentioned, it was also arranged that all future releases should be paid for "C. O. D.," or the All Star Company would refuse delivery. "Mr. Pipp" was the next film released. November 21, 1915. The Willat Studio again refused to release it, until the entire balance then due it was paid; accordingly, the sum of $8,100 was paid in two installments and the picture released. This payment covered the October rent and other charges in arrears and left an over payment of $97.50, which was credited to the All Star account.

The next film to be released was one known as the "Pope." This account stood originally in the name of Raver, the president of the All Star Company, but was transferred directly to that company, at Raver's request. The "Pope" positives produced by the Willat Studios and upon which they had an artisan's lien were released December 10th, without any payment being demanded, under the express agreement arrived at between Farnham and Willat (the general manager of the Willat Studio) that they could hold the remaining negative of the "Garden of Lies" of much greater value, as security for the entire indebtedness.

There is no question in my mind that these oral arrangements were made as stated, and that the parties by their course of dealing clearly showed that all property in the possession of the Willat Studio should stand as security for the entire balance due, rent included. The Willat Studio was unwilling to depend on the credit of the All Star Company. The contract of May, 1914, was a single and entire contract.

All film work had been delivered under it except the film the "Garden of Lies," and I think that, if the Willat Studios acquired any lien upon the goods, that lien attached to any goods left in the lienor's possession to the extent of the whole balance due for work done. By returning a portion of the goods, the lienor waived its lien pro tanto, but could retain its lien for the residue which remained in its possession. Wiles Laundry Co. v. Hahlo, 105 N. Y. 234, 11 N. E. 500, 59 Am. St. Rep. 496; Conrow v. Little, 115 N. Y. 387, 22 N. E. 346, 5 L. R. A. 693.

I am not impressed by the argument of the trustee that no lien could attach to the negatives because the Willat Studios did not in any way enhance the value of the negatives, as in the case of type, De Vinne v. Rianhard, 9 Daly (N. Y.) 406. That may be true, if the lienor claimed only a strict artisan's lien under the statute or at common law; but, in this case, the lienor claims under an express oral agreement, and does not depend on a prior valid lien. The work done in developing and printing the negative and positive of the "Garden of Lies" is conceded to be a lien. I see no material difference between that case and the others.

As to the rent in arrears: The same agreement covers that also. If the parties choose to give a lien for the rent item, it was within their power, and cannot be disputed now. The contract was single and entire. The rent and film work are not severable, the guaranty of 1,200,000 feet of film work being a part of the consideration for the lease of the studio. The parties have construed the agreement in the manner set forth, and have acted on this understanding on two previous occasions.

It is true that the lien was created in conversations between the respective officials. This was not a modification of the written contract, but "a change rendered necessary by subsequent events in the method of its execution only." Hurley v. Atchison, T. & S. F. R. R., 213 U. S. 134, 29 Sup. Ct. 469, 53 L. Ed. 729. It was a subsequent arrangement caused by the All Star's financial condition, and enabled it to retain its studio, notwithstanding default in payments, and was distinctly for its benefit. If any consideration was necessary for the oral agreement, the Willat Company's forbearance of dispossess proceedings was sufficient, and the bankrupt company, having received the benefit of this forbearance and thus enabled to market its films, cannot be heard to question the verbal arrangement made and is estopped to deny its validity. Hamilton Trust Co. v. Clemes, 17 App. Div. 152, 45 N. Y. Supp. 141.

While the lienor was not bound to extend forbearance for any definite time, still its actual forbearance furnishes a good consideration. Hobart v. Verrault, 74 App. Div. 444, 77 N. Y. Supp. 483; Strong v. Sheffield, 144 N. Y. 392, 39 N. E. 330.

The trustee claims that the liens asserted by the lienor were of different characters and could not be transferred to other property, viz., a right of withholding delivery of goods in which the seller has the property right cannot be transferred to goods held under an artisan's lien, though both are commonly called liens. One is regulated by the Sales Act, and the other by the Lien Law. But this is not applicable to the present case, for the contract was not one of sale, but of lease; the lessee, the All Star Company, to supply the stock to the lessee for completion. The fact that the bankrupt did not actually supply the stock, but that the stock was purchased by the lessor and charged to the lessee, was to enable the lessee to carry out its contract, and must be construed "as a change rendered necessary by subsequent events in the method of its execution only." Hurley v. Atchison, T. & S. F. Ry., 213 U. S. 134, 29 Sup. Ct. 469, 53 L. Ed. 134.

Whether the title to the stock passed to the bankrupt is a question of intention. I think that title did pass to the bankrupt, and that the printing thereon was work done on the property of the bankrupt which enhanced its value. N. Y. Sales Law (Laws 1911, c. 571), § 134; N. Y. Lien Law (Consol. Laws, c. 33) § 180; Blumenberg Press v. Mutual Mercantile Agency, 177 N. Y. 362, 69 N. E. 641; s. c., 77 App. Div. 87, 78 N. Y. Supp. 1085.

As to the provability of the claim of the Willat Studio against the bankrupt, the rent for February accruing after the filing of the petition January 30, 1915, must be disallowed and the claim allowed for $4,109.44 only. But as the lien covers a reasonable period after the bankruptcy the lien extends to the February rent, when the trustee abandoned the lease, and the claim is immaterial. Courtney v. Fidelity Trust Co., 219 Fed. 57, 134 C. C. A. 595.

There is no preference involved, as the record is bare of any evidence of insolvency.

I think that the lien of the Willat Studio is valid and the trustee should pay the lienor the full amount due it, viz., the sum of $4,942.77.

The referee's certificate, filed April 9, 1916, was as follows:

I, Stanley N. Dexter, one of the referees of the court of bankruptcy, do hereby certify that in the course of proceedings in said cause before me an order, a copy of which is annexed, was made and filed in my office on the 11th day of March, 1916; that on March 30, 1916, the parties herein, feeling aggrieved thereat, filed petitions for review within the time provided by stipulation of the parties.

The question presented for review is: Did the referee err in adjudging that the Willat Studios & Laboratories, Inc., had a valid lien on certain property of the bankrupt and in directing the payment from the funds of the bankrupt the full amount of the claim of said "Willat Studios & Laboratories, Inc.," in priority of the claims of the general creditors, and in refusing to charge said lien or with the actual incident to the determination, and in charging said lienor with the expenses of the sale and the commissions of the trustee and referee on the amount of the lien.

A summary of the evidence on which such order was based is more fully set forth in the decision of the referee hereto annexed.

The following papers are handed up for information from the court:

1. Claim filed by Willat Studios & Laboratories, Inc.
2. Stipulation of the parties and order dated May 5, 1915.
3. Petition and order to show cause filed July 6, 1915.
4. Decision of referee dated February 10, 1916.
5. Further decision of referee dated March 6, 1916.
6. The various exhibits of the parties.
7. Stipulation dated November 5, 1915.
8. Minutes of hearing beginning August 31, 1915.
9. Order allowing claim of Willat Studios.
10. Order extending time to appeal.
11 and 11A. Petitions for review filed March 30, 1916.

The said questions are hereby certified to the judges for an opinion thereon.

John L. Lockwood, of New York City, for petitioner.

Gilbert W. Roberts, of New York City, for respondent.

LEARNED HAND, District Judge. [1, 2] I do not think it is necessary to suppose that the parties made a bilateral contract of forbearance and security. Perhaps the lessor might have evicted the lessee at any time and the lessee have reclaimed the films without paying for more than the work actually done on each particular film reclaimed. That question I leave open. Yet the parties intended that the lessor should have some security for the rent and the other charges, and this security was to be by retaining the films. So much indeed is too plain for dispute; the only question is whether the lessor gave up any quid pro quo for that security. De facto it did, because it let the time pass and it let the lessee keep possession. Under the ninth article of the agreement it could have taken away that possession at any time, and its failure to do so would have been a good enough consideration, if the parties actually intended an exchange. Forbearance, even without an agreement to forbear, will serve as a consideration, if it be completed. Morton v. Burn, 7 Ad. & El. 19; Crears v. Hunter, L. R. XIX Q. B. D. 341; Alliance Bank v. Broom, 2 Drewry & Sm. 289; Edgerton v. Weaver, 105 Ill. 43. The lessor gave the forbearance and relied only on the lien. That was a performance.

It is quite true that here there was no express reference to forbearance in the contract and no statement that the lien was in exchange for it, but the situation reasonably implied that the parties so intended it. If the lessor had not received the assurance, and if the lessee had tried —it would not doubt have been successful—to take away the films without paying the rent, there can be no doubt that the lessor would have eventually asserted its rights under the ninth article. The cause of its inaction was the promised lien; it cannot be supposed that the connection between that inaction and the agreement to give security was wholly unconscious. It may be that the lessor did not actually contemplate eviction, yet even that is likely; certainly it contemplated an immediate assertion of such rights as it had, and that was enough. Hurley v. At., Top. & Santa Fé, 213 U. S. 126, 29 Sup. Ct. 466, 53 L. Ed. 729, seems to have nothing to do with the case.

The final question is of authority. Farnham was the assistant manager, in charge of the details under Raver, who was the president and general manager. The two were generally intrusted with the active conduct of the affairs of the company. In the everyday management of the affairs of the company they were faced with the alternative of insisting upon an immediate release of the property at the risk of the landlord's resort to his remedies, or of telling him to hold the goods till he got payment. The practical decision that the second alternative was for the company's benefit seems to me quite within the powers to be naturally implied in such officers. It is quite wrong to speak of it as though it were a pledge de novo of the assets. The films were already pledged for part of the charges; the term was in effect pledged by the right of re-entry. All the officers did was to substitute a more convenient security for a less convenient, and this arose in the daily dispatch of business of the company.

[3] As to costs, I award them against the estate. I have repeatedly held that, when a trustee contests the claim of an outsider, the contro-

versy is inter partes, and costs follow as in any other case. Why the creditors of a bankrupt should have any warrant for litigation free from the usual risks, I confess I have never been able to see. If the bankrupt had resisted the claim unsuccessfully, no one would think of asking exemption for him; but, when it is the creditors, it seems to be very hard, at least in this district, to dislodge the notion that they are in some sense wards of the court and entitled to special consideration.

Petition to review dismissed. Order affirmed, but with costs to the Willat Film Manufacturing Company.